# CIRCUIT COURT U. S.

## NEW YORK, SEPTEMBER, 1823.

United States
vs.    } MURDER.
William Gourlay.

Present—Honorable *Smith Thompson.*

Honorable *William P. Van Ness.*

Messrs. *Tillotson* and *Haines,* Counsel for the U. States.

Messrs. *Van Wick, Baldwin, Scott,* and *Blunt,* Counsel for the Prisoner.

On Friday, the 10th of September, at 9 o'clock in the morning, commenced the trial upon an indictment found

---

At two o'clock they again came to the bar, when the court discharged the jury, it being expressly understood that such discharge was without the consent of the prisoners' counsel, and directed the cause to be tried anew.

On Wednesday, the 22d, the prisoners, being called to the bar, offered by their counsel a special plea, setting forth the particulars of the former trial, and praying a discharge on the constitutional provision that no man shall be twice put in jeopardy for the same cause, and alleging the discharge of the former jury as equivalent to an acquittal. To this plea the attorney of the United States demurred, and the court directed an argument on its validity, which consumed the remainder of the day. On the following morning the court delivered a learned and elaborate opinion, overruling the plea of the prisoners, and directing the trial to proceed. This opinion was principally directed to two points: 1. That the lives of the prisoners had never been in jeopardy, as the words are applied in the constitution, and by the common law. 2. That the insanity of a juror is one of those cases of necessity in which the court may exercise a sound discretion to discharge a jury, it being essential for the due administration of justice.

at the present term of the court against William Gourlay, for murder. The following jurors were examined and sworn, viz. : Calvin W. Howe, William Finch, Daniel Oakley, John S. Bradford, Nathaniel Rathbone, Smith Lane, Daniel Banvard, Samuel Maverick, Samuel Dixon, Dennison Wood, Lyman Fitch, and John Reid. The indictment was read, consisting of three counts, of which the first charged the offence to have been committed in a bay, the second in a haven, and the third on the high seas, near Cadiz, in the kingdom of Spain.

N'W YORK,<br>Sept. 1823.<br><br>The U. States<br>v.<br>Gourlay.

Mr. Tillotson opened the case for the United States, and observed, that he deemed it proper to state explicitly, not only the facts and circumstances attending the offence which was charged, but also the law by which those facts were to be governed. In civil cases, questions of law were referred to the court; but in criminal trials, the jury were made the judges as well of the law as of the facts. In this case, the grand jury had charged the prisoner with wilful murder ; and if the fact of the killing be proved by the United States upon the prisoner, the law would presume it to have been done with malice. It would then rest upon the accused to produce such circumstances of mitigation as would reduce the crime from the highest grade of homicide. He should expect, in order to substantiate the charge, to show : 1st. The killing ; 2d. That it was done by the prisoner ; and 3dly. That it was done within the jurisdiction of this court. The facts, as he understood, were briefly these :

That on the 14th of June last, the ship Canton was lying in the bay of Cadiz, in an open road-stead, where the sea was flowing in, on board of which the offence

charged was perpetrated by the prisoner upon William Jones. The Canton was an American ship, of which the master was then on shore; the prisoner the first, and the deceased the second mate. In the afternoon of that day, a quarrel had been sought, authority oppressively exercised, and a blow given by the prisoner. At the close of the evening, Jones went into the berth assigned him by the captain, which was in a single state-room, the berths being placed the one over the other. Gourlay came down and ordered Jones out of his berth. The latter refused, when Gourlay pulled off the clothes, and left him naked. Jones then jumped out, a struggle ensued, which continued until they got out of the state-room into the main cabin. Gourlay then cried murder, and an indentation appeared from Jones' teeth. Jones, it would be proved, was about 21 years of age, a humble, tranquil, feeble young man, whilst the prisoner, as the jury would observe, was stout and athletic. After they had been disengaged from the struggle, Gourlay looked steadfastly for some time at the deceased, and then said, " By God! I'll shoot you," stepped back into his room, took his pistol, levelled it, and shot him dead on the spot. These were the facts, as Mr. Tillotson was advised, and he presumed no effort would be made to reduce the grade of the crime below that of manslaughter.

Mr. Tillotson then cited various authorities to show from the cases found in the books, that the present was not a case of manslaughter, but of murder. Among them were 1 East, 233, Notes to Chitty's C. L., and 3 Chitty, 730. The prisoner was indicted under the 8th section of the act of congress entitled " an act for the punishment of certain crimes against the United

States," passed 30th April, 1790.   That section de-
clares,  "that if any person or persons shall commit,
upon the high seas, or in any river, haven, basin or bay,
out of the jurisdiction of any particular state, murder or
robbery, or any other offence, which, if committed within
the body of a county, would, by the laws of the United
States, be punishable with death *** being thereof con-
victed, shall suffer death."   Should the jury, on the
question of jurisdiction entertain doubts, whether the
United States intended to punish murder in cases like
the present, he presumed the jury would find the facts
specially, so that the question might be revised and finally
determined by the Supreme Court of the United States.
Such a course would be decorous and correct, and it
would be peculiarly proper, inasmuch as a general ver-
dict (the jury being judges both of the law and the fact)
would be conclusive, and could never be revised.

Captain Charles M'Cauley was sworn on the part of
the prosecution.  He commanded the ship Canton on
the 14th of June; but was absent on shore at the time
the affray happened.   The ship lay about a mile from
the molehead in Cadiz, and about two and a half miles
from Fort Catalina, on the opposite side, which is forti-
fied, and now occupied by the French.   It was far in
from the chops of the harbour.  It is about seven and a
half miles from Rota to Cadiz, and about three miles
from Fort Catalina, to the Fort Escaronada, (towards
Rota,) opposite Cadiz.   The water is about five or six
fathom.  All within the point of Rota and the Fort St.
Sebastians is called and occupied as the Bay of Cadiz.

N'W YORK, Sept. 1823.

The U. States v. Gourlay.

The Canton did not approach nearer Cadiz on account of the shallowness of the water. She came to anchor, unloaded and loaded in that place. In the winter such ships go farther in. It is the usual place for mooring such ships. Had just discharged the ship the day of the affair. The King of Spain entered Cadiz the next day after. The Canton was an American ship. Her owners were Americans.

Thomas M'Cready identified and proved the register of the ship Canton, and its American character.

Jacob Smith was a carpenter on board the ship Canton, on the 14th of June, in the port of Cadiz. About sunset he put away his tools. A lighter was alongside the ship with salt; and as the ship was short of hands, and wished to discharge the lighter, witness laid to and assisted in taking out the salt. A little past 9 o'clock witness missed the prisoner, by whom he was soon after called down into the cabin. Knew not what Gourlay wanted, but went down. Gourlay addressed him, and said, " Carpenter, I have brought you, and Vesey, and the steward down to witness that I order Mr. Jones out of the berth." Does not recollect he said this or that berth; deceased was then lying in his own berth. Gourlay repeated the order to Jones to get out. Jones replied he would not go out alive; that, he said, was the place appointed by the captain for him to sleep, and there he would sleep. Prisoner turned round and said, " Carpenter, haul that man out of his berth." Witness refused, stating that he was willing to obey his orders, but unwilling to drag the man out of his berth, for he didn't know the consequence. Prisoner then pulled the bed-

clothes from Jones; seized and dragged him into the dining room, where they had a clinch together, and in passing the mahogany table they nearly capsized it in the scuffle. Witness put his hand on the table, and held it till they passed it. He went on deck, leaving them scuffling, and asked the men to go down and part the two mates, or they would kill each other. A man named Jones, (not the deceased) said, "let them fight, it's none of our business."

Whilst receiving this answer, murder was cried in the cabin, in about a minute after witness left it. Witness went down, and prisoner held up his hand, and said, "This man has bit me." It was on the left hand; a slight wound which bled a little; also a small wound on the cheek. Gourlay and deceased were then clinched; Jones being partly down on his knees, and Gourlay above him, and had the command of him. There was a little place on the side of Gourlay's cheek, and the blood running from his hand. Witness, with his right hand, laid hold of Gourlay by his left arm, and of Jones with his other by the shoulder, and thus separated them. Jones was a small man, five feet three inches high. Knows his height, for he made his coffin. Begged Jones to go on deck. Deceased said, "Where shall I go? Am I to be murdered?" Witness told Jones to go on deck and sleep in Black's berth, in the forecastle. Black was then on shore. "You say you are going to leave the ship to-morrow. Gourlay (the prisoner) says he is going to leave the ship to-morrow. Go, and stay in the forecastle to-night: Gourlay is in a passion now, and in the morning, when the captain returns, all will be well." Jones was then standing with his back near the com-

panion way, and the prisoner with his back to the state-room door. They were about four feet apart, and the witness about four feet from them. Gourlay then said, "By God I'll shoot you"—stepped back about a foot, reached back his arm, took down a brass pistol, cocked it, and shot him dead. Prisoner had two pistols, usually loaded, suspended over the berth where he slept. Witness took the candle, then standing on the table, looked upon Jones, and perceived he was dead. He did not stir—turned and said, " Mr. Gourlay, you have killed the man." Gourlay replied, " I can't help it; he ought to have obeyed my orders." Witness, Wm. Vesey, and George Brown, were the only persons present at the time Jones was killed. The men on deck, hearing the report of a pistol, came below. They insisted upon prisoner's being immediately put in irons, and kept in that way until the captain returned in the morning. It was done, and he remained so until morning, when, as soon as witness thought he could get into the city, he took a boat, went ashore, and found Capt. M'Cauley, to whom he related the facts. Captain M'Cauley, Captain O'Sullivan, the American deputy consul, and four Spanish soldiers, came on board, took Gourlay ashore, took off his irons, and put him in prison in Cadiz, where he remained until the vessel was ready to sail. Witness supposes he was taken ashore by order of the deputy consul.

In answer to questions by Mr. Tillotson, witness said he thought it was about two minutes from the time the struggle ended, to the time that the pistol was fired, and the deceased shot. In this time, witness gave the advice above stated; and prisoner moved along in the mean

time to near the state-room where the pistol was. The
wounds of the prisoner were, one on his knuckles, and
the other on his cheek; does not know whether either
was a bite or not. The deceased had no weapon of any
kind in his hand.

Mr. Blunt, of counsel for the prisoner, requested that
the other witnesses be removed while the witness was
under examination. The Court granted the request.

Witness continued. In the afternoon previous to the
alleged murder, at four o'clock, the deceased had three
or four men in the hold, trimming or stowing salt. De-
ceased could not please the prisoner, who quarrelled with
him in the hold, and called him a damned worthless
scoundrel. Deceased came on deck, and said he would
have nothing more to do with the ship, and would quit
when the captain came on board. A few words passed,
when prisoner struck the deceased on the head. A scuf-
fle ensued, and the parties were directly separated, and
prisoner told witness to go below and get the irons, and
put Jones in them. Witness went and got them, and
came on deck, and found deceased with the cook's tor-
mentors, or flesh fork, in his hands, and swore he would
not be put in irons alive. Prisoner seized the deceased
to take away the instrument, but could not do it. Wit-
ness, by order, took hold of one end of it, but soon let
go; thought he would let Gourlay get them away him-
self.

Gourlay then ordered Vesey to get the cutlass. Vesey
got it; Gourlay received it, but soon afterwards put it
away, saying, "I will not use such a thing against you."

N'W YORK, Prisoner then ordered a pair of pistols to be brought up.
Sept. 1823. Vesey brought the pistols, and laid them down under the
The U. States dripstone, aft of the companion. Did not know whether
v. Gourlay knew the pistols were there. Prisoner succeed-
Gourlay. ed in getting away the tormentors from deceased, and
threw them overboard. From that time nothing further
than words occurred until sundown. Had words after
that. Jones was not put in irons. Deceased was shot
under the left eye, near the nose. Died immediately.
Did not move. Thinks the ball did not pass through the
head.

Cross-examined by Messrs. Blunt and Scott.—Witness
had a little dispute with prisoner, but more with deceased.
About three weeks previous he was about putting on the
fore hatch bar, and prisoner told him, (witness) to go to
hell, and struck him. Witness took up the handspike,
but laid it down, and did not strike, an explanation having
taken place.

Witness had always treated prisoner as a brother.
Prisoner once took witness forward in a state of intoxica-
tion from the cabin. Witness was asleep, and didn't
know whether he refused to go. It was some time be-
fore this affair, three or four weeks, while in Cadiz. No
ill will was entertained by witness against prisoner.
He did not see the whole transaction. Went on deck
and heard prisoner's voice cry murder, and went down
as before stated. Deceased did not strike prisoner in
the eye previous to taking the pistol. Didn't notice that
prisoner had a black eye. There was a black spot on
his cheek. Does not know how it came. Saw the
parties both looking at each other. The deceased was

not in the attitude of fighting. Deceased had nothing
on but his shirt when dragged from his berth. Prisoner
is an Englishman. Jones retired to his berth, refusing
to do any more duty, while others were busy at work.
Prisoner did not say, when he commanded Jones to leave
his berth, "come out and do your duty;" but "go out
of this place, I am afraid of you." Prisoner expressed
fear of his life, if deceased remained there. Prisoner
was quarrelsome, and deceased more so. The crew were
busy at work three hours after deceased had quit labour.
When the Captain left the vessel his direction to prisoner
was to get the salt aboard, that we might not be compelled
to work on Sunday. It was then Saturday. It was not
exactly an order, but he expressed it as his wish and ex-
pectation, and directed prisoner to give an extra glass
of grog to get it finished. When prisoner said "by God
I'll shoot you," deceased replied, "I can't help it."
Witness was examined by the deputy consul, who is
a Spaniard, and speaks broken English, and heard the
examination read once or twice since his arrival here.
He now speaks from recollection, and his testimony
would be the same if he had not heard that examination
read. He was examined on board the ship. No Span-
ish officer was present. He remembers the transaction
perfectly well. Witness does not recollect that prisoner
ordered deceased to leave the cabin : after the cry of
murder, went down. A little before he shot, he said,
get out of my sight."

William Vesey, a young man, apparently about 17 or
18 years of age, was next called. He was a mariner on
board the Canton. Saw Gourlay, the prisoner, go into
the cabin with a candle in his hand. It was about nine

N'W YORK, Sept. 1823.

The U. States
v.
Gourlay.

o'clock. Witness was in the cabin. Gourlay says to Jones, "Come out of that cabin, you shall not sleep there to night." Jones was then undressed in the berth, where he had been, probably, about an hour. Gourlay added, "My life is not safe if you sleep there : come out, and you shall have as good a bed as I have; but you shall not sleep under me, for my life is not safe." Deceased replied, "No, I'll not come out." Prisoner rejoined, "I'll make you." Prisoner then went on deck, called down the carpenter, (Jacob Smith,) the steward, and himself, (Vesey,) for witnesses, and said to us, "I call you down to be witnesses, that I order Jones out of that berth." The prisoner then ordered him out again; deceased replied he would not come out alive. Prisoner then directed the carpenter to lend a hand, who said no, he did not like to do that. Prisoner replied, "then I must do it myself," and began pulling off the clothes, continuing to order deceased out. When prisoner had stripped the bed, deceased got up, and sat in the bed. Prisoner took him by the arm, and eased him out of the berth. No violence was offered, and no resistance attempted. Both went into the cabin together : as they approached the cabin door, prisoner shoved deceased, but not so as to hurt him; and here they closed and had a good deal of struggle. Prisoner cried murder, and sung out "O my God, he is biting me." The carpenter then rushed between, and parted them, begging deceased to go forward and sleep in the forecastle. Deceased replied no, he would not go forward, but would sleep in the place appointed by the Captain. Jones then said, "what shall I do? am I to be murdered?" This was just as they let go. Prisoner immediately upon that

said, "By God! I'll shoot him," (not you, as Smith stated,) addressing himself, as witness supposed, to the carpenter, and, in the act of saying so, made a rush to the door, squeezing himself through it sidewise into the state-room, took the pistol from his berth, and shot the deceased through the half-door; for the cabin door being open, half shut the state-room door. Deceased died immediately. Thinks the pistols were previously cocked, for witness often made up prisoner's bed, and found them cocked, and half-cocked them himself. Gourlay had a pair of pistols. Did not see the other pistol, whether it was cocked or not. Witness was of the opinion that not more than fourteen seconds elapsed from the time the prisoner uttered the words, "By God! I'll shoot him," before he executed the deed. It was not more than a minute from the parting in the scuffle to the time of shooting. Gourlay was standing still and looking at Jones, whilst Jones said, "What am I to do—am I to be murdered?" Prisoner appeared to be in a great rage. In the course of the afternoon, Jones said he would do no more duty until he had seen Captain O'Sullivan. Gourlay said Jones did not do his work properly. Gourlay struck him in the face, but left no mark, nor did it stagger him. Deceased doubled his fist, and said to prisoner, Look out. Gourlay said to Jones, Go on shore. Jones said he would if Gourlay would let him have a boat. Gourlay said he would'nt give him a boat. Gourlay then said, I will put you in irons, and ordered the carpenter to bring the irons up. Deceased declared he would not be put in irons alive. Prisoner replied, Well, see if I don't, and ordered witness to bring him a cutlass, which he brought, and Gourlay laid it on the hatch, but did not use it. Jones made a rush, and got a pair of tormentors,

Gourlay seeing it, came up, and after considerable struggle got them out of Jones' hands, and threw them overboard. This was about 5 or 6 o'clock in the evening. They then parted. Witness brought two pistols to prisoner, shook out the priming on his way, and placed them under the dripping stone. Did not hear Gourlay order Jones to leave the cabin after the scuffle; he had not time. It was over like a flash of lightning. Jones was small, but pretty strong. Gourlay was then sick of the liver complaint. Has seen Jones clinch a larger man than himself. Captain did not assign any berth, but Jones usually slept in that he lay down in.

Cross-examined by Mr. Baldwin. Gourlay quarrelled with the cook, because cook let Jones have the tormentors, and ordered witness to get pistols to intimidate the cook. Witness brought the pistols, but shook the priming out, for which Gourlay afterwards thanked witness, and said he had lived thus long without murdering any one, and should be sorry to have that crime attached to his name. In the afternoon, Gourlay said to the men, "Will you obey me?" They said yes. He replied, "Then I order you not to obey that man," meaning Jones. The priming was knocked out before sundown. Gourlay took the pistols in the cabin with him, and probably primed them for the use of the ship again. Gourlay was mostly upon deck that afternoon and evening. He went down once to put on a shirt, his own being nearly torn off in one of the frays. The act of shooting was almost instantaneous after the separation. Gourlay's shirt collar was torn off.

George Brown, a black boy, who was steward on

board the Canton, testified that Gourlay ordered Jones out of the berth. Jones refused. Gourlay then called for help, and the carpenter came, but refused to assist. Gourlay then took him out. They then struggled, and Jones bit Gourlay, and Gourlay called out murder; and Jones let Gourlay go. Jones was biting Gourlay. Gourlay then stepped back, and said, " By God! I'll shoot you." Did not see the carpenter part them. They were struggling a couple of minutes. About a minute after separation Gourlay shot Jones.

John Ray. The wound was on the left side of Jones' face, under the eye. Did not see the affray.

Here the prosecution rested. A recess of half an hour was given, when the prisoner's defence commenced.

Mr. Scott commenced the defence, on the part of the prisoner, and occupied the floor nearly two hours. He adverted to the doctrine of homicide *se defendendo*; and although he did not place this case distinctly on that ground, yet he explained and enforced to the jury the authorities on that question, submitting to them whether a mutinous disobedience to the lawful authority of the prisoner, acting, in absence of the captain, as commander of the ship, would not justify his act, on the ground that he was authorized to use as much force as was requisite to carry into effect his lawful commands. 4 Bl. Com. 183. Mr. Scott also insisted that the crime of which the prisoner was guilty, at most, was manslaughter, and not murder; and for this he cited the following authorities: 4 Bl. Com. 193, 1 East, 224, 232, and Rowley's case, and the case of the Scotch sol-

N'W YORK,
Sept. 1823.

The U. States
v.
Gourley.

dier, 1. East, 251. He further contended that the court had no jurisdiction of the case. It was a crime, he said, committed in the harbor of Cadiz, within the jurisdiction and sovereignty of Spain; that sovereignty must, in its nature, be exclusive and absolute, and cannot be concurrent. He referred to, and commented upon, the following authorities: 1 Azuni, 223, 233, 234, 235, art. 3; Hubner, p. 244; Vattel, 187, § 287, p. 236; United States v. Rice, 4 Wheaton, 246; 4 Cranch, 136, S. P., 144, 145, S. P.; United States v. Palmer, 4 Wheaton, 633; 1 Gallison, 625; United States v. Wiltberger, 3 Wheaton, 94, 95.

Don Thomas Stoughton, the Spanish consul, was then called and sworn. He defined what he considered to be the bay of Cadiz, and gave it as his opinion that the Spanish authorities had always exercised jurisdiction over the waters, not only where the Canton lay, but all that extent within a line drawn from Rota to the castle of St. Sebastians, the extreme point of the peninsula of Cadiz. Had never heard it doubted.

Hugh Roberts was born in Cadiz, and resided there many years. Considered the bay of Cadiz less extensive than last witness. Supposed it to be included within a line from fort Catalina direct to Cadiz. The position of the Canton would still be within it. The outer part of the bay from the line referred to, he considerc as open road.

Captain M'Cauley was called again, and stated the instructions he had given prisoner to have the salt taken in that afternoon. Considered all the waters within a

line from Rota to St. Sebastians as forming the harbor of
Cadiz. Gourlay was taken on shore by the American deputy consul, assisted by the Spanish authorities. Knew
of no refusal on the part of the Spanish authorities to take cognizance of the offence. Jones had served on board the ship but two or three days. Gourlay had been employed but a few days. Had perceived neither of them to be quarrelsome.

The testimony here closed on both sides, and Mr. Haines, associate counsel with the district attorney, stated the authorities to be adduced in support of the points of law which the prosecution would assume.

Mr. Van Wyck, in summing up for the prisoner, expressed a confidence that he would receive at the hands of the jury the same measure of justice as if he were one of our own citizens. And the melancholy case before them, he observed, exemplified the feeble hold we have on life. Neither the prisoner nor the deceased were aware that in so short a period the latter would be precipitated into eternity. Whether the agency of the prisoner in causing that event was the result of premeditated malice, and a hardened heart, or whether it was produced by the impulse of sudden passion, was the momentous inquiry which the jury were called upon to try. Had he been tried by the Spanish authorities, no jury would have interposed; and whether the circumstance of his falling into the hands of the American consul may have been favorable to him or not, yet if this court has not jurisdiction of the offence, the jury were bound on their oaths to acquit. If the Spanish government had cognizance of this case, this court has not.

N'W YORK, It would not do to say, that because the Spanish author-
Sept. 1823. ities did not try him, therefore we will. The jury were
The U. States acting as agents of the government, and were bound to
v. administer justice according to law. The several states
Gourlay.
of the union made a constitution, by which they delegated
part of their sovereignty to congress. Whatever they
did not impart, they retained. By the eighth section of
the constitution, authority was given to congress " to
define and punish piracies and felonies committed on the
high seas, and offences against the law of nations." To
felonies committed on the high seas, and to none other
is this authority, derived from the constitution, to be
applied. But the act of 1790, in conformity to which
this indictment is drawn, would seem to have reference,
not merely to the United States, but to all the rivers,
havens, basins and bays in the whole world. But
congress can legislate only for those persons who owe
allegiance to the United States. The construction con-
tended for would make it assume a jurisdiction over
the bays, rivers, and harbors of all Europe. Such
cannot be the true construction of the act. If it were
to be allowed, our jurisdiction would extend up the
Thames, the Rhone and the Danube. Our government
could not have the hardihood to claim it. Our system
of jurisprudence was derived from England, and by the
law of that realm offences were to be punished in the
place where they were committed. It is competent for
congress to give construction to the term high seas, in
our own, but not in a foreign country. If they have
not power to pass laws to punish crimes committed in
the territories of Spain, they have not power to invest a
court with that authority. This was not a crime against
the peace and dignity of the United States, but of Spain.

The act of the consul does not confer jurisdiction on this court. There was no power in Spain, unless that specially of the king, which could surrender and transfer the prisoner from the jurisdiction of that country. And what a precedent would such a decision create! Suppose a felony be committed on board an American ship, lying in the Thames. The accused is entitled to the benefit of testimony; and what shall be done? The witnesses, many of them perhaps Englishmen, are to be taken on board and brought to New York to attend the trial! Thus the ships of the United States are to be freighted back with felons, and witnesses. Suppose a British ship is at anchor in the harbor of New York, on board of which a homicide is committed upon a custom-house officer, would we not claim jurisdiction, and try the offence? Or suppose the reverse, that a custom-house officer had killed a British seaman, would we endure it, that the offender, and all the witnesses to the act, should be transported to Great Britain for the trial of the accused? Or suppose, in the very case of the Canton, that the prisoner, on board that ship, in the bay of Cadiz, had killed, instead of William Jones, a Spanish grandee, or custom-house officer of Spain, would the authorities of that country have suffered him to be taken to America for trial? The vice-consul, it is true, assumed the power of judge, jury, and police officer; but this assumption can give no jurisdiction to the court. Mr. Van Wyck then commented ably, and at large, upon the facts as proved, which he contended did not make out the charge as set forth in the indictment.

Mr. Baldwin, on the same side, observed that there was certainly some difficulty in determining whether this case

N'W YORK, came under the jurisdiction of the court. It took place
Sept. 1823. in the bay of Cadiz, within the acknowledged jurisdiction
The U. States of Spain ; and to decide that it is subject to the authority
v.
Gourlay. of this court, would necessarily involve the principle
that a man may be tried twice for the one offence. This
was abhorrent to our own laws and the laws of England.
Piracy presents a different question. There, a first
would be a bar to a second trial ; for, it being a crime
against all nations, each has the right to make its own
laws to punish it. It will be objected that Great Britain
assumes jurisdiction of offences committed on board her
ships all over the world. But the parliament of Great
Britain is said to be omnipotent. The constitution of
the United States is limited, and we cannot follow their
example. Mr. Baldwin adverted to the differences in
the definition of the high seas, as construed by the
common law and admiralty courts, and contended that
however the construction might be in relation to them,
yet the true intent and meaning of Congress, in the act
referred to, was that the high seas were those waters over
which all nations had the right of passing, but neither
had the exclusive jurisdiction; and that the words
havens, bays, &c., were meant to provide for cases
wherein, like the river La Plata, the mouth is so wide
that jurisdiction cannot be exercised from the shore, or
bays, like those of Bengal, Biscay, or Honduras. Mr.
Baldwin commented, at considerable length, upon the
construction of the law, as applied to the case, and ad-
verted to 1 Gallison's Reports, 625; Ross' Case, 5 Whea-
ton, 200, and § 43 of Graydon's Digest, and concluded his
remarks by an address to the jury upon the matters of
fact in evidence.

Mr. Haines, on the part of the prosecution, contended
for the positions which follow. Our limits preclude the illustrations and arguments by which they were enforced.
He argued,

1. That the murder was committed on the high seas.

2. That the 8th section of the statute of Congress, passed in 1790, clearly included the crime, even admitting that it was committed on the high seas.

3. That Congress has the constitutional power to pass the law alluded to; and

4. That the crime committed by the prisoner was murder, and not manslaughter.

Mr. Tillotson, district attorney, concluded the argument in support of the prosecution, and confined his remarks principally to an exposition of the facts, and the grade of crime to which they necessarily pointed. His observations were perspicuous and liberal, and occupied the court until 11 o'clock in the evening. Judge Thompson then addressed the Jury, and presented to them the law and the facts, in a very able and clear point of view. At half past 11 the Jury were sent out, and returned at one o'clock on Saturday morning, with a special verdict—guilty of murder in the bay of Cadiz. This verdict leaves the question of jurisdiction, which was an important point in the trial, open for revision. The Judge stated that he was not clear upon the point, and suggested to the jury the verdict they gave, should they

be satisfied that the crime in its nature amounted to mur-
der.   The cause will be  carried  up to the Supreme Court
of the United  States.